## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRENDON BROPHY, | |
| Plaintiff, | CIVIL ACTION NO. 1:18-CV-02169 |
| v. | (KANE, J.)<br>(MEHALCHICK, M.J.) |
| THE HARTLEY DOERING GROUP, INC. d/b/a ROSSMOYNE ANIMAL EMERGENCY TRAUMA CENTER, | |
| Defendant. | |

## MEMORANDUM

Before the Court is plaintiff Brendon Brophy's motion to compel and for sanctions (Doc. 33) concerning his claim for damages under the Americans with Disability Act (ADA), 42 U.S.C. §§ 12101-12213, the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654, and state law. (Doc. 1). Defendant is The Hartley Doering Group, Inc. d/b/a Rossmoyne Animal Emergency Trauma Center (the "Center") (Doc. 1). By Order dated October 31, 2019, District Judge Yvette Kane referred the parties' discovery dispute to the undersigned Magistrate Judge for disposition pursuant to 28 U.S.C. § 636. (Doc. 27). Both parties have filed briefs in support of their respective arguments, and Brophy's motion is therefore ripe for disposition. (Doc. 34; Doc. 37).

For the following reasons, Brophy's motion to compel and for sanctions (Doc. 33) is **GRANTED IN PART and DENIED IN PART** to the extent indicated herein.

## I.    BACKGROUND AND PROCEDURAL HISTORY

This case stems from allegations that the Center interfered with and violated Brophy's rights under the ADA, FMLA, and Pennsylvania common law, culminating with The Center's termination of Brophy in May 2017. (Doc. 1, at 2-5).

A. BROPHY'S COMPLAINT

The Center hired Brophy in July 2015 as a veterinarian at its trauma center, where Brophy tended to the emergency and critical care of small animals. (Doc. 1, at 3). Brophy was promoted to Medical Director in October of the same year. (Doc. 1, at 3). Almost two years later, in April 2017, Brophy learned that one of the Center's head technicians, Bobbie Ditzler, had ordered prescription medication for herself using Brophy's medical license. (Doc. 1, at 3). Brophy became distraught and immediately informed his supervisor, Dr. Meg Weil, about Ditzler's illegal use of his license. (Doc. 1, at 3).

On April 3, 2017, after suffering from a panic attack at work, Brophy saw his primary care physician and was diagnosed with anxiety, acute anxiety attacks, and gastritis. (Doc. 1, at 3). Brophy's physician recommended that he stay at home for six weeks. (Doc. 1, at 4). He provided medical documentation and paperwork to Dr. Weil, who, upon information and belief, approved Brophy's request for a medical leave of absence. (Doc. 1, at 4). Around the same time, Weil confirmed to Brophy that the Center's co-owner and manager, Mike Doering, and another veterinarian, MJ Potter, had also used Brophy's medical license for their personal use. (Doc. 1, at 4).

After Brophy requested medical leave, the Center began to treat him differently, e.g., the administrator of the Center's Facebook page blocked Brophy's ability to access the page. (Doc. 1, at 4). On May 9, 2017, a coworker sent Brophy an email indicating that the Center had permanently removed Brophy from the work schedule and hired his replacement. (Doc. 1, at 4). Four days later, i.e., May 13th, Brophy received a letter from the Center indicating that the Center was terminating him for being on disability for over 30 days in violation of his employment contract. (Doc. 1, at 4). Brophy's employment contract permitted the Center to

terminate Brophy "if during a period of 'twelve (12) consecutive months' [Brophy] is 'not able to perform fulltime work for thirty (30) days in any employment year' due to his disability" ("Termination Clause"). (Doc. 1, at 4).

Brophy asserts that (1) the Termination Clause *per se* violates the ADA; (2) the illegal use of his medical license and the Center's related conduct caused him serious health conditions under the FMLA and disabilities under the ADA; (3) the Center failed to engage in the interactive process to determine reasonable accommodations; and (4) the Center terminated Brophy because of his disabilities, in retaliation for his request for accommodations, and because Brophy sought protected leave. (Doc. 1, at 5). He asserts claims under the ADA and FMLA, as well as under the Pennsylvania Workers' Compensation Act.

## B. DISCOVERY DEMANDS AND RESPONSES

Brophy served a demand for the production of documents on February 27, 2019. (Doc. 36, at 2). He broadly sought all "documentary material" supporting or relating to Brophy's allegations, documents referring to Brophy and his request for an accommodation, copies of correspondence between Brophy and the Center's management and between Brophy and Weil, and documents relating to the Center's decision to terminate Brophy. (Doc. 1, at 34, at 5; Doc. 34-1, at 2-6). The Center served responses in May 2019 including five emails between Brophy and Weil sent in early April 2017. (Doc. 34, at 5; Doc 34-1, at 10-12). These emails reflect that Brophy requested leave based on medical documentation, Brophy informed Weil that he had made an appointment with a therapist, and Weil informed Brophy that he was "currently on LOA [i.e., leave of absence] with full pay for 60 days." ("Leave Emails") (Doc. 34, at 6). Brophy's counsel sent a discovery deficiency letter, and on May 30, 2019, the Center

produced 16 additional emails, only one of which referred to Brophy. (Doc. 34, at 6; 36, at 2).

In July 2019, the parties deposed Doering and his former wife, Sabrena Hartley, a co-owner of the Center. (Doc. 34, at 6-7; Doc. 36, at 2). Both denied ever having seen or discussed the Leave Emails. (Doc. 34, at 6-7; Doc. 34-1, at 32-34, 84-87). Additionally, at Hartley's deposition, counsel for the Center stated, "I don't think we produced text messages." (Doc. 34, at 7; Doc. 34-1, at 82). Based on the assertion that no texts had been produced, Brophy's counsel served a supplemental document demand in which he sought text messages relating to Brophy between (1) Hartley and Weil; (2) Doering and Brophy; (3) Hartley and Brophy; (4) Doering and Weil; and (5) Doering and Hartley. (Doc. 34, at 7; Doc. 34-1, at 120). The Center responded by providing "additional text messages and emails between Mr. Doering and Ms. Hartley with Dr. Weil and Plaintiff." (Doc. 34, at 7).[1]

Brophy's counsel gained contact with Weil, who had been unreachable, in September 2019. (Doc. 34, at 8). Weil was able to provide several emails indicating that Doering and Hartley were aware of and had discussed the contents of the Leave Emails. (Doc. 34, at 8). For example, while Doering and Hartley had denied ever seeing the April 3, 2017 email in which Brophy requested leave and raised the issues alleged in his complaint, an email provided by Weil reflects that Weil had forwarded that email to Doering and Hartley. (Doc. 34, at 8; Doc. 34-1, at 125). Weil also provided an email indicating that she had forwarded one of Brophy's Leave Emails to Dr. Charlotte LaCroix of Veterinary Business Advisors, Inc., who counsel later learned was an attorney retained to review Brophy's employment situation.

---

[1] Although Brophy asserts that "additional texts" were received, it is unclear whether and to what extent text messages were previously provided.

(Doc. 34, at 8; Doc. 34-1, at 124). Brophy's counsel was unable to reach defense counsel to address these discovery deficiencies. (Doc. 34, at 8).

In October 2019, Brophy's counsel sent an email demand to the Center's counsel seeking, for the period from April to June 2017 and relating to Brophy, text messages and emails between Doering and Hartley, and Doering, Hartley, and Weil, among other things. (Doc. 34, at 9; Doc. 34-1, at 29). Counsel for the Center responded, the same month, with an email in which he asserted that any Doering–Hartley communications were privileged because they were husband and wife during the relevant period for which the communications were sought. (Doc. 34, at 9). Counsel also relayed the Center's representation that there were no additional emails or other communications responsive to the most recent email demand. (Doc. 34, at 9).

In late October, the parties deposed Weil. (Doc. 34, at 9). At that time, defense counsel hand-delivered supplemental responses to Brophy's discovery demands. (Doc. 34, at 9-10). In those responses were copies of the emails that Weil had provided to Brophy's counsel one month prior. (Doc. 34, at 10). Weil testified about an April 5, 2017 conference call during which she, Doering, and Hartley consulted with Dr. LaCroix, and she also testified to certain details concerning the consultation generally. (Doc. 34, at 10). According to Brophy's counsel, although LaCroix is any attorney, defense counsel waived the attorney-client privilege by (1) permitting Weil testify to what was said during the conference with LaCroix, (2) failing to timely raise a proper objection based on privilege, (3) falsely disclaiming having known that LaCroix was an attorney prior to and during much of the deposition, (4) requesting that Weil provide to defense counsel notes that she took during the conference and in her investigation, and (5) disclosing to Brophy's counsel that he, counsel for Center, had

reviewed LaCroix's email recommendations concerning Brophy, e.g., that the Center obtain additional information about Brophy's health conditions. (Doc. 34, at 11-12).

After Weil's deposition, counsel for Brophy discovered one additional, relevant email that he alleges to have inadvertently failed to provide in response to the Center's discovery demands – this email was never produced by defense counsel. (Doc. 34, at 10).

In late October 2019, Brophy's counsel informed the Court of the parties' discovery impasse. The undersigned held a discovery conference with the parties on November 13, 2019, during which the parties' attorneys addressed and argued their respective positions – following that conference, the Court ordered Brophy's counsel to file the instant motion to compel and to file for an *in camera* review a privilege log and the documents discussed at the conference. (Doc. 31).

## II.   LEGAL STANDARDS

### A.   DISCOVERY GENERALLY

The general scope of discovery is outlined by Federal Rule of Civil Procedure 26(b)(1):

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

> Fed. R. Civ. P. 26(b)(1).

Relevance, for purposes of discovery, does not hinge on admissibility at trial. Hence, the Court needs only determine if the information sought "is relevant to any party's claim or defense and proportional to the needs of the case" as provided in Rule 26(b)(1), or whether the defendants are embarking on a "fishing expedition." See *United States v. Cuthbertson*, 630

F.2d 139, 144 (3d Cir. 1980). Even under the revised Rule 26, District Courts have discretion to shape the permissible scope of discovery. See *Greene v. Horry Cnty.*, 650 F.App'x 98, 99 (3d Cir. 2016) (non-precedential) (citing *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 281 (3d Cir. 2010)). Courts consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). However, Rule 26(b)(2)(C) requires the court to limit the extent of discovery that would otherwise be permitted by the rules of civil procedure or by local rule if it determines that the information sought is outside the scope permitted by Rule 26(b)(1). Further, "[T]he discovery rules are meant to be construed quite liberally so as to permit the discovery of any information which is relevant and is reasonably calculated to lead to the discovery of admissible evidence." *Westfield Ins. Co. v. Icon Legacy Custom Modular Homes*, 321 F.R.D. 107, 111 (M.D. Pa. 2017) (quoting *Fid. Fed. Sav. & Loan Ass'n v. Felicetti*, 148 F.R.D. 532, 534 (E.D. Pa. 1993). "As an initial matter, therefore, all relevant material is discoverable unless an applicable evidentiary privilege is asserted." *Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000).

B. PRIVILEGED MATERIALS

Rule 26 allows for the discovery of "*nonprivileged* matter." Fed. R. Civ. P. 26(b)(1) (emphasis added). Thus, "[a]ny material covered by a properly asserted privilege would necessarily be protected from discovery, pursuant to Rule 26(b)(1)." *Pearson*, 211 F.3d at 65. Under Rule 501 of the Federal Rules of Evidence, the "common law--as interpreted by United States courts in the light of reason and experience--governs a claim of privilege unless any of the following provides otherwise: [1] the United States Constitution; [2] a federal statute; or

7

[3] rules prescribed by the Supreme Court." Fed. R. Evid. 501 (bullet points and spacing omitted). However, "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. The effect of Rule 501 is that "federal privilege law applies to federal claims, and state privilege law applies to state claims." *See Knepp v. United Stone Veneer*, LLC., No. CIV. A. 4:06-CV-1018, 2007 WL 2597936, at *1 (M.D. Pa. Sept. 5, 2007).

Here, the Center invokes two privileges: the marital communications privilege and the attorney-client privilege.

### 1. Confidential Marital Communications

Both federal and state common law "protect confidential marital communications." *Trammel v. United States*, 445 U.S. 40, 51 (1980); *see also Fallowfield Dev. Corp. v. Strunk,* No. 89-CV-08644, 1990 WL 52749, at *4 (E.D. Pa. Apr. 25, 1990) (noting that "federal common law … continues to embrace a privilege against revealing confidential marital communications"). The marital communication privilege "reaches only those communications made in confidence [during a valid marriage] and intended to be confidential." *United States v. Ammar, 714 F.2d 238, 258 (3d Cir. 1983)* (internal quotation marks omitted) (quoting 2 Wright & Miller, Federal Practice & Procedure 2d § 406 (1983)). This privilege applies in both civil and criminal cases and is rooted in the policy of "encourag[ing] open and honest communications between husband and wife and accord a sufficient degree of privacy to marital relationships." *Knepp,* 2007 WL 2597936, at *4.

Marital communications falling under this rule "are presumptively confidential," and the party seeking to overcome the privilege bears the burden of demonstrating otherwise. *See Blau v. United States*, 340 U.S. 332, 333 (1951). The privilege does not apply to acts (as opposed

to utterances), nor does it apply to communications made in the presence of a third party "because that person's presence negatives the presumption of privacy." *Hill*, 967 F.2d 902, 911 n.13 (3d Cir. 1992) (internal quotation marks omitted).

### 2.   Attorney-Client Communications

Attorney-client communications are also privileged. This privilege attaches to "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007) (internal quotation marks omitted), *as amended* (Oct. 12, 2007). "'Privileged persons' include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation." *Teleglobe*, 493 F.3d at 359 (citing Restatement (3d) Lawyers § 70).

Because "the attorney-client privilege obstructs the truth-finding process, it is construed narrowly." *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1423 (3d Cir. 1991). "A communication is only privileged if it is made 'in confidence.'" *Teleglobe*, 493 F.3d at 361 (citing Restatement (3d) Lawyers § 68). Where "persons other than the client, its attorney, or their agents are present, the communication is not made in confidence, and the privilege does not attach." *Teleglobe*, 493 F.3d at 361. However, "[a]s a general matter, the privilege is not destroyed when a person other than the lawyer is present at a conversation between an attorney and his or her client if that person is needed to make the conference possible or to assist the attorney in providing legal services." *Miller v. Haulmark Transp. Sys.*, 104 F.R.D. 442, 445 (E.D. Pa. 1984) (privilege not waived by presence of insurance agent who arranged coverage and aided in preparation of answer); *see also* Quagliarello v. Dewees, 802 F.Supp.2d 620, 632-33 (E.D. Pa. 2011) (finding no waiver of attorney-client privilege where

18-year-old student-plaintiff consulted with her lawyer in the presence of her parents and a neighbor who facilitated her obtaining legal counsel); *Harkobusic v. Gen. Am. Transp. Corp.*, 31 F.R.D. 264, 266 (W.D. Pa. 1962) (holding attorney-client privilege applied to communications between client's brother-in-law and various attorneys where brother-in-law was acting as client's agent in seeking legal advice). "These exceptions are consistent with the goal underlying the privilege because [this] type of disclosure is sometimes necessary for the client to obtain informed legal advice." *Westinghouse*, 951 F.2d at 1424.

C. Motions to Compel and for Discovery-Related Sanctions

Brophy moves to compel the production of previously undisclosed discovery and also moves for various sanctions, including the imposition of costs for re-deposing Doering and Hartley, and allowing a forensic analysis of their email accounts to determine whether all responsive emails have been reproduced (or for a spoliation inference). Under Rule 37(a), "[i]f a party fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions." Fed. R. Civ. P. 37(a)(3)(A). A party "may move for an order compelling . . . production[] or inspection" where, e.g., "a party fails to produce documents." Fed. R. Civ. P. 37(a)(3)(B)(iv).

The Court is empowered to impose sanctions for failures to comply with discovery under Rule 37 and the Court's inherent powers. *Marsulex Envtl. Techs. v. Selip S.P.A.*, No. 1:15-CV-00269, 2019 WL 2184873, at *7 (M.D. Pa. May 21, 2019). "Through its sanctioning power under Rule 37, a court may direct that certain facts be taken as established, prohibit the sanctioned party from supporting or opposing certain claims or defenses, strike pleadings in whole or in part, stay proceedings, dismiss the action, render a default judgment, or treat the failure to obey court orders as contempt of court." *Marsulex Envtl. Techs. v. Selip S.P.A.*,

2019 WL 2184873, at *7. The Court may also fashion appropriate sanctions for conduct (e.g., spoliation) that abuses the judicial process. *Marsulex Envtl. Techs. v. Selip S.P.A.*, 2019 WL 2184873, at *7

## III.   DISCUSSION

In his motion for discovery and for sanctions, Brophy seeks an order granting the following relief:

- Directing the Center to produce all text messages and emails between Hartley and Doering for the period from April to June 2017 relating or referring to Brophy;

- Permitting Brophy to re-depose Hartley and Doering at the Center's expense;

- Directing the Center to produce its email exchange with Dr. Charlotte Lacroix on April 5, 2017, and April 6, 2017, concerning Brophy;

- Permitting Brophy to depose Dr. Charlotte Lacroix regarding her conversations with and recommendations to the Center concerning Brophy; and

- Directing the Center to pay for a forensic analysis of the email accounts of Hartley and Doering to allow Brophy to determine whether all responsive documents have been produced or, in the alternative, granting a spoliation inference.

(Doc. 34, at 3).

### A.   RELEVANCE

As a threshold matter, the Center does not appear to seriously dispute that the discovery Brophy seeks is relevant under the Rule 26's liberal discovery scheme. The allegations in this case include that the Center knew about Brophy's serious health condition and disability, failed to work toward providing him with reasonable accommodations, and terminated him based on his condition and disability. Discovery relating to the Center's

reaction to and ultimate decisions concerning Brophy during the pertinent period may be relevant to these issues.

B. TEXT MESSAGES AND EMAILS BETWEEN HARTLEY AND DOERING

Brophy seeks an order compelling the Center to produce all text messages and emails between Hartley and Doering for the period from April to June 2017 relating or referring to Brophy. He argues that because Hartley and Doering are co-owners of the Center and "the decision-makers with respect to [Brophy's] request for leave and [the Center's] decision to terminate [him]," there are "no doubt multiple responsive communications between [them] to which the [marital communications] privilege simply does not attach." (Doc. 34, at 15). The Center objects to producing the texts and emails between Hartley and Doering based on irrelevance and the marital communications privilege. No arguments are advanced concerning relevance. (Doc. 37, at 5-6). Regarding the marital privilege, the Center submits that the communications sought by Brophy "were not made in Ms. Hartley's and Mr. Doering's capacities as co-owners of [the Center]" and were instead personal observations and opinions shared in the confidence of their relationship. (Doc. 37, at 6). There is no dispute that Hartley and Doering were married during the relevant period. (Doc. 34, at 15).

Brophy argues that the texts and emails between Hartley and Doering fall within an exception to the marital communication privilege because these communications concern "ordinary business matters." (Doc. 34, at 15). He refers the Court to the decision in *Dommel Properties, LLC v. Jonestown Bank & Tr. Co.*, No. 1:11-CV-02316, 2013 WL 4855427, at *5 (M.D. Pa. Sept. 11, 2013), which held that under Pennsylvania state law, "the privilege for confidential communications generally excludes knowledge or communications between spouses relating to matters of business or property in the absence of contrary indications."

12

(*See* Doc. 24, at 15). He also relies on Florida and New York federal cases that support the same proposition. (Doc. 34, at 15 (citing *Hanger Orthopedic Grp., Inc. v. McMurray*, 181 F.R.D. 525 (M.D. Fla. 1998); *Atl. Richfield Co. v. Triad Petroleum, Inc.*, 113 F.R.D. 686, 687 (S.D.N.Y. 1987))).

While these cases may be persuasive, they are not directly controlling, as they involve applications of state law rules concerning the marital communications privilege and the related ordinary-business-matters exception. *See Dommel Properties, LLC*, 2013 WL 4855427, at *3 n.2 (applying "Pennsylvania privilege law" under Rule 501 of the Federal Rules of Evidence where plaintiffs only remaining claims were state law claims); *Hanger Orthopedic Grp., Inc.*, 181 F.R.D. at 528 (noting that Rule 501 directs the application of state privilege law in a diversity-of-citizenship case); *Atl. Richfield Co.*, 113 F.R.D. at 687 n.2 ("It is undisputed that New York is the state whose law should be applied in the circumstances of this case.").[2] In contrast, because Brophy asserts both federal and state law claims, federal privilege law applies. *See Pearson v. Miller*, 211 F.3d 57, 66 (3d Cir. 2000).

The issue remains whether, under federal common law, the ordinary-business-matters exception applies. There is scant case law concerning the exception in the context of privileges and exceptions under federal common law. *See, e.g.,* Exceptions—Business Communications, 25 Fed. Prac. & Proc. Evid. § 5595 (1st ed.) (acknowledging the development of "a general exception for business communications" and noting that "[t]here are a good many federal

---

[2] Although the court in *Atl. Richfield Co.* does not indicate that it is a diversity-of-citizenship case, in a related decision, the court notes that "[s]tate law [] determines whether a matter is privileged when it is relevant to a state law claim or defense being raised before a federal court, which is the case in *this diversity action*. *Atl. Richfield Co. v. Triad Petroleum, Inc.*, 120 F.R.D. 471, 472 (S.D.N.Y. 1988) (emphasis added).

decisions holding that the communications privilege does not apply to property or business transactions, often on the theory that these are not intended to be confidential," although the recent cases all seem to be applications of state law rather than the federal common law).

There is no bar to the Court's "resort to state law analogies for the development of a federal common law of privileges in instances where the federal rule is unsettled" and the Court does so here and will adopt the rule applied in *Dommel* that the marital communications "privilege generally excludes knowledge or communications between spouses relating to matters of business or property in the absence of contrary indications." *See Wm. T. Thompson Co. v. Gen. Nutrition Corp.*, 671 F.2d 100, 103-04 (3d Cir. 1982); *Dommel Properties, LLC*, 2013 WL 4855427, at *3. Even the Center concedes that business-related communications should be disclosed.

 The Court has conducted an *in camera* review of the text messages provided by the Center's counsel on November 20, 2019. Most of the relevant texts involved a third party (Dr. Weil) and therefore do not qualify for the marital communication privilege. *See Hill*, 967 F.2d at 911 n.13. The texts between only Hartley and Doering are of a business nature and therefore not cloaked with privilege merely based on their then-existing marriage. It is unclear to the Court the extent to which any of these texts have already been produced to Brophy. To the extent these texts have not been produced to Brophy, the Court directs the Center to provide to Brophy, within 21 days of this Order, the full extent of text communications during the period from April to June 2017 to which Brophy is otherwise entitled, as follows:

| Date and Time Sent | | Sender and Recipient(s) |
|---|---|---|
| April 4th | 9:06 a.m. | Weil to Hartley and Doering |
| | 9:23 a.m. | Weil to Hartley and Doering |
| April 5th | 2:10 p.m. | Weil to Hartley and Doering |

|          | 2:10 p.m. | Hartley to Weil and Doering |
|          | 2:11 p.m. | Weil to Hartley and Doering (two messages) |
|          | 2:11 p.m. | Doering to Hartley (two messages) |
|          | 2:11 p.m. | Hartley to Weil and Doering |
|          | 2:12 p.m. | Doering to Hartley |
|          | 2:13 p.m. | Doering to Hartley and Weil |
|          | 2:20 p.m. | Doering to Hartley and Weil |
|          | 2:26 p.m. | Doering to Hartley and Weil |
|          | 2:55 p.m. | Weil to Hartley and Doering |
| April 7th | 11:30 a.m. | Hartley to Doering |
| May 19th | 9:44 a.m. | Doering to Hartley |
|          | 10:17 a.m. | Hartley to Doering |
|          | 10:18 a.m. | Doering to Hartley |
|          | 10:19 a.m. | Hartley to Doering |
|          | 10:20 a.m. | Doering to Hartley (first word only) |

As to any emails responsive to Brophy's discovery requests that the Center may have withheld based on the marital communications privilege, the Center is directed to provide those emails to the Court for an *in camera* review within 14 days of the Order accompanying this Memorandum, unless, based on this Court's finding that the marital communication privilege does not extend so far as to protect from disclosure messages between co-owner spouses concerning an employee's request for disability leave and surrounding circumstances, *in camera* review is unnecessary, and the Center will produce the responsive documents to Brophy without further review by the Court.

Accordingly, Brophy's motion to compel the Center to produce Doering–Hartley texts and emails pertaining to these allegations for the relevant period is **GRANTED** to the extent that the Center is ordered to (1) produce to Brophy the 20 text messages indicated herein, *supra*; and (2) to the Court for an *in camera* review any relevant emails that the Center believes are privileged as marital communications unless the Center, based upon this Memorandum, determines that it will produce the emails without further review by the Court.

## C. Re-Depositions of Hartley and Doering

Brophy also seeks (1) permission to re-depose Hartley and Doering; and (2) an order directing the Center to pay for the costs related to their depositions, submitting that the Center's repeated failures to produce discovery warrant such action. (Doc. 34, at 16). The Center, while amenable to making Doering and Hartley available for a second round of depositions "if the Court believes additional depositions are necessary," submits that it should not be required to pay for the costs associated with re-deposing these witnesses. (Doc. 37, at 5). The Center contends that the delays in producing discovery were not due to intentional concealment, that all relevant discovery has now been produced, and that "due to the use of two (2) different email addresses by Dr. Weil, some correspondence may not have been located through the initial search." (Doc. 37, at 8).

Under "Federal Rule of Civil Procedure 30(a)(2), a party must obtain leave of court to depose a witness 'if the deponent has already been deposed in the case.'" *Jarzyna v. Home Properties, L.P.*, 783 F. App'x 223, 227 (3d Cir. 2019) (quoting Fed. R. Civ. P. 30(a)(2)(A)(ii)). The decision whether to "permit a party to conduct a second deposition of someone who has already been deposed" turns on a consideration of "the factors set forth in Rule 26(b)(2)." *Newill v. Campbell Transp. Co.*, No. 2:12-CV-1344, 2013 WL 6002349, at *7 (W.D. Pa. Nov. 12, 2013). Under Rule 26(b)(2), courts are required to limit discovery if it is determined that

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the

parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii).

Here, it is unclear how useful additional depositions of these already deposed witnesses will be. While the Center does not dispute that it belatedly turned over discovery, the general subject of those emails – the extent to which the Center knew about, addressed and reacted to Brophy's circumstances – was discussed at great length during the witnesses' prior depositions. Each denied having knowledge of certain emails and information, whereas the later-disclosed emails, which may never have seen the light of day but for Weil's disclosures to Brophy, indicated that the opposite was true: they had knowledge and in fact reacted to the Brophy's communications. Having the information in those emails now, there may be little more to adduce on the topics raised in the emails. This sets this case apart from cases where, for example, "the original deposition concerned different topics than the proposed second deposition would." *Hurley v. JARC Builders, Inc.*, 164 F.R.D. 39, 40 (E.D. Pa. 1995).

The Center does not argue that Brophy can obtain the information he seeks from another source. (*See* Doc. 37, at 4-8). Due to the Center's discovery lapses, Brophy has not had "ample opportunity to obtain the information by discovery in th[is] action." Further, the Center does not contend that it will be too burdensome to produce Doering and Hartley for depositions when compared with the damages Brophy seeks, the parties' resources, or the importance of the issues. Thus, while "the discovery sought" may, at the end of the day, be "cumulative or duplicative," it is does not appear so "unreasonably" cumulative or duplicative such that the Court must deny Brophy's application to depose Doering and Hartley a second time.

However, the Court will deny Brophy's request for an order directing the Center to pay for the costs of re-deposing Doering and Hartley. Though the Court is empowered to grant costs as a sanction for failures to provided discovery, the belated disclosure of the emails in this case do not rise to the level of warranting such a sanction. Notably, the Court has conducted an *in camera* review of various text messages, the late disclosure of which Brophy bases, in part, his motion for sanctions, and there is no indication of an intentional effort to conceal evidence. *Jarzyna v. Home Properties*, L.P., 783 F. App'x 223, 227 (3d Cir. 2019) (noting that Rule 37 authorizes sanctions "when a party completely fails to respond or provide information" but denying sanctions based merely on delayed disclosures). Furthermore, defense counsel has indicated that Weil used two different email accounts, which caused the delays in responding to Brophy's demands.

Brophy's motion to compel this category of discovery is therefore **GRANTED IN PART**, and Doering and Hartley must appear for second depositions. The motion is **DENIED** in all other respects. .

### D.  EMAIL EXCHANGES WITH AND DEPOSITION OF DR. LACROIX

The third and fourth discovery-related items for which Brophy seeks an order pertain to Dr. LaCroix. As indicated herein, *supra*, the Center does not argue that Brophy's requests concerning LaCroix are irrelevant. Rather, the Center asserts the attorney-client privilege concerning all communications between and among the Center, Doering, Hartley and Weil and LaCroix. (Doc. 37, at 6). Brophy, for his part, argues that the Center's counsel waived the privilege during Weil's deposition.

The central issue concerns Weil's deposition testimony, which Brophy's counsel has provided as Exhibit K in support of the motion to compel. Weil testified that she, Doering,

and Hartley indeed consulted with LaCroix via telephone conference. Weil discussed, among other things, (1) her reaching out to LaCroix at Doering's and Hartley's request; (2) the purpose of consulting with LaCroix, which was to review Brophy's communications with the Center and his employment status and discuss "the illegal ordering of prescription medications for humans under a veterinarian's license"; (3) her receipt of LaCroix's response to Weil and the Center with a recap of her assessment of "the entire situation"; (4) that LaCroix was reviewing Brophy's contract to "find out how to get rid of [him],the least amount of money and the least noise to have him leave the company." (Doc. 34-1, at 148-149).

After Weil testified to the purpose of reviewing Brophy's contract, the Center's counsel objected, stating, "I'm going to object to these questions. I see Dr. LaCroix is also an attorney. To the extent that Dr. LaCroix provided legal advice to the company, that would remain privileged." (Doc. 34-1, at 149). Brophy's counsel responded that he believed that any privilege may have been waived, to which defense counsel indicated to Weil: "You can answer. We'll just make the objection and we can preserve that." (Doc. 34-1, at 149). The Center's counsel also emphasized that "[w]e agreed, and by the way, we should make note of the record that we're not waiving any objections." (Doc. 34-1, at 149; *see* 34-1, at 137 ("It is hereby stipulated and agreed by and between counsel that . . . all objections, except as to the form of questions, be reserved until the time of trial.")).

Weil then went on to testify that Doering and Hartley requested that she assist LaCroix "in trying to come up with reasons for [Brophy] to be terminated," although Weil was unable to find any reason to terminate Brophy. (Doc. 34-1, at 150). She testified that she forwarded her notes of the conference call to Brophy's counsel, including notes indicating that LaCroix was "taken aback by the behavior at [the Center] and the response of the owners." (Doc. 34-

1, at 150). She reiterated that they discussed during the conference Brophy's contract and the employee handbook, and that they had reached out to LaCroix to get her expertise on the issue. (Doc. 34-1, at 154-157). The Center's counsel also asked Weil to provide her notes – to both parties – concerning her investigations because, although each party possessed "thumbnail" versions of these notes, the notes were illegible. (Doc. 34-1, at 162-163; Doc. 34, at 11).

After reviewing Weil's deposition testimony and counsel for the Center's objections, along with the initial objection, it does not appear that a waiver occurred here. There is no dispute that an attorney-client relationship existed here between the Center and its agent and LaCroix. "[O]nce communications are shown to be privileged, the burden shifts to the opposing party to show waiver of the privilege." *EMC Ins. Co. v. Zicolello*, No. 4:13-CV-00825, 2014 WL 123687, at *3 (M.D. Pa. Jan. 14, 2014) (Kane, J.). Brophy has not overcome the waiver here. At the outset, it should be noted that "[a]ttorney-client privilege belongs to the client, and only the client may waive it." *EMC Ins. Co.*, 2014 WL 123687, at *3. "Therefore, in determining the waiver of attorney-client privileged communications, it is the intent of the client that controls the Court's analysis." *EMC Ins. Co.*, 2014 WL 123687, at *3 (internal quotation marks omitted).

Given this standard, it is not insignificant that Weil, though an agent-participant in the consultations with LaCroix at the time, is a former employee of the Center who, when Brophy was terminated, no longer worked for the Center. (Doc. 34-1, at 150); *see, e.g.*, *Wellnx Life Scis. Inc. v. Iovate Health Scis. Research Inc.*, No. 06 CIV. 7785 (PKC), 2007 WL 1573913, at *4 (S.D.N.Y. May 24, 2007) ("Welch, who was not an employee of MuscleTech at the time of disclosure to Wellnx, did not have the authority to waive the privilege on behalf of his former

employer." *See United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir.1996) (quoting *United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) ("Appellants correctly argue that Jau Hwa, a past employee of Sunrider Corporation, lacked authority to waive the corporation's attorney-client privilege.").

Weil's disclosures, in any event, did not waive the privilege as to all communications between LaCroix and the center. The initial pre-objection questioning of Weil consisted of the Center's and Weil's communications *to* LaCroix concerning the purpose for contacting LaCroix, along with Weil's assertion that she received LaCroix's response and assessment, and the Center's goal of terminating Brophy with the least amount of money be expended and "noise." The mere fact that LaCroix was contacted, provided with information, and responded to the Center's issues does not, under these circumstances, constitute a waiver of the Center's attorney-client privilege. *See, e.g., Miller v. Haulmark Transp. Sys.*, 104 F.R.D. 442, 445 (E.D. Pa. 1984) (An objection was made to the discovery of the document at the time it was produced and marked as an exhibit to the deposition. Dominion has cited no case in which a waiver was found in the same circumstances. I cannot conclude as Dominion suggests that the production of a document over objection constitutes a voluntary waiver of the privilege.). Center's counsel's request for notes from Weil, to which both parties were privy, did not have the effect of invalidating the waiver. Weil produced various documents and information to Brophy's counsel, at Brophy's counsel's request. Even assuming Brophy is correct that defense counsel cannot possibly argue that he did not know LaCroix was an attorney until some point in Weil's deposition, no waiver occurred.

Finally, the Court is mindful that it must balance "the notions that, while the attorney-client privilege belongs to the client, the attorney, acting as the client's agent, may be

sufficiently negligent in protecting the privilege that it may be waived as to particular documents disclosed." *Fid. & Deposit Co. of Maryland v. McCulloch*, 168 F.R.D. 516, 523 (E.D. Pa. 1996). Given defense counsel's attorney-client-privilege objections and the limited scope of what Weil revealed during the deposition, any inadvertent disclosure of privilege communication cannot be said to rise to the level such that the Court would be compelled to find a waiver. *See, e.g.*, *Helman v. Murry's Steaks, Inc.*, 728 F. Supp. 1099, 1104 (D. Del. 1990) ("The better reasoned rule, however, provides that inadvertent disclosure does not waive the privilege. The holder of the privilege is the client. It would fly in the face of the essential purpose of the attorney/client privilege to allow a truly inadvertent disclosure of a privileged communication by counsel to waive the client's privilege." (internal citation and quotations omitted)).

Therefore, Brophy's motion to compel the production of emails to and from LaCroix and the Center and permitting Brophy to depose LaCroix is **DENIED**.

E. FORENSIC ANALYSIS OF EMAIL ACCOUNTS BELONGING TO HARTLEY AND DOERING

Finally, the Court is not inclined to grant a forensic analysis of Doering's and Hartley's email accounts. For the reasons already stated, *supra*, the Court is not inclined to grant costs at this juncture given the record before it. Further, though there have been lapses in discovery, they are not such as to justify compelling the Center to pay for costs associated with further discovery due to such lapses.  Many emails have been turned over, and defense counsel has provided a reasonable basis (i.e., Weil's two email addresses) for any confusion leading to the belated disclosure of certain emails. However, the Court is now *ordering* the Center to provide all relevant emails responsive to Brophy's demand, the failure of which may result in sanctions, including costs or an adverse inference. While the Center's counsel has represented

that all relevant nonprivileged emails have been turned over, counsel and the Center now have the benefit of the Court's order clarifying, e.g., the inapplicability of the marital communications privilege. To the extent that the Center believes certain emails are privileged or of questionable relevance and should therefore not be turned over, these emails should be provided to the Court, **within 14 days of this Order**, for an *in camera* review. If the Center, having the benefit of this Memorandum and the Court's conclusions regarding the martial communications privilege or the attorney-client privilege, then it should advise the Court that no *in camera* review will be necessary as it has produced all emails to Brophy.

Brophy also seeks a spoliation inference in connection with this application. Specifically, he seeks an adverse inference that there are additional missing emails referenced by Weil. Whether a sanction of spoliation is appropriate turns on a consideration of three factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994). At this juncture, the Court does not find grounds for a spoliation inference, particularly given the scope of this Order.[3]

As such, this aspect of Brophy's motion to compel and for sanctions is **DENIED**.

---

[3] The undersigned Magistrate Judge is not the judge who will preside over trial in this matter, and the parties have not consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. As such, this ruling is without prejudice to the issue being raised again at trial before the trial judge. If the parties do choose at some point to consent to the jurisdiction of the Magistrate Judge, the ruling is still without prejudice to the parties raising the issue at the time of trial as appropriate.

IV.   <u>CONCLUSION</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** that Brophy's motion to compel and for sanctions is **GRANTED IN PART and DENIED IN PART** to the following extent:

1. The Center is directed to produce to Brophy's counsel, **within 14 days of this Order**, the following text messages reflected in their submission:

| Date and Time Sent | | Sender and Recipient(s) |
|---|---|---|
| April 4th | 9:06 a.m. | Weil to Hartley and Doering |
| | 9:23 a.m. | Weil to Hartley and Doering |
| | | |
| April 5th | 2:10 p.m. | Weil to Hartley and Doering |
| | 2:10 p.m. | Hartley to Weil and Doering |
| | 2:11 p.m. | Weil to Hartley and Doering (two messages) |
| | 2:11 p.m. | Doering to Hartley (two messages) |
| | 2:11 p.m. | Hartley to Weil and Doering |
| | 2:12 p.m. | Doering to Hartley |
| | 2:13 p.m. | Doering to Hartley and Weil |
| | 2:20 p.m. | Doering to Hartley and Weil |
| | 2:26 p.m. | Doering to Hartley and Weil |
| | 2:55 p.m. | Weil to Hartley and Doering |
| | | |
| April 7th | 11:30 a.m. | Hartley to Doering |
| | | |
| May 19th | 9:44 a.m. | Doering to Hartley |
| | 10:17 a.m. | Hartley to Doering |
| | 10:18 a.m. | Doering to Hartley |
| | 10:19 a.m. | Hartley to Doering |
| | 10:20 a.m. | Doering to Hartley (first word only)[4] |

2. The Center is directed to produce, **within 14 days of this Order**, for an in *camera* review, any relevant emails that the Center believes are privileged as marital communications, unless the Center determines, based upon this Memorandum and Order, that it will produce any emails without review.

3. The Center is permitted to re-depose Michael Doering and Sabrena Hartley.

_____

[4] The Center may redact the second sentence from this message.

4. The Center is ordered to provide to Brophy's counsel, **within 14 days of this Order**, all emails in its possession not previously produced or being produced to this Court for *in camera* review, concerning Brophy's allegations and responsive to his discovery demands.

5. Brophy's motion is denied in all other respects.

BY THE COURT:

Dated: June 15, 2020

*s/ Karoline Mehalchick*

**KAROLINE MEHALCHICK**
**United States Magistrate Judge**